IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 1, 2009 Session

## BLACKBURN & McCUNE, PLLC
v.
## PRE-PAID LEGAL SERVICES, INC. AND
## PRE-PAID LEGAL SERVICES OF TENNESSEE, INC.

**An Appeal from the Circuit Court for Davidson County**
**No. 08C-461      Amanda McClendon, Judge**

_____

**No. M2009-01584-COA-R3-CV - Filed June 30, 2010**

_____

This appeal involves legal insurance. The defendants have sold legal insurance for many years. The plaintiff law firm provided legal services to policyholders pursuant to the defendants' legal insurance policies. After Tennessee began to regulate legal insurance, the defendants were required to obtain State approval of their insurance rates and plans. The defendants submitted plans to the State. The plans included proposed rates and anticipated claims expenses, consisting primarily of the fees paid to the plaintiff law firm. The State informed the defendants that the initial filings did not reflect a sufficient loss ratio, that is, ratio of expenses to premium rates. The defendants revised the State filings to reflect an increase in the compensation paid to the plaintiff law firm. At the same time, the defendants presented the plaintiff law firm with a contract that required the plaintiff to pay the defendants for certain administrative services. The amount to be paid to the defendants essentially equaled the amount by which the defendants increased the plaintiff's compensation rate. Years later, the plaintiff discovered facts that caused it to conclude that the contract was a subterfuge to allow the defendants to recoup the increased compensation to the law firm while appearing to comply with the State's loss ratio requirement. The plaintiff informed the State of these facts and of its suspicion that the purpose of the arrangement was to circumvent the loss ratio requirement. After receiving this information, the State took no adverse action against the defendants. The plaintiff then filed this lawsuit seeking restitution, asserting that the contract with the defendants was fraudulently induced and that it was void and unenforceable as against public policy. The plaintiff also asserted a claim under the filed rate doctrine, seeking to recover the difference between the pay rate that the defendants filed with the State and the rates actually paid to the plaintiff. The trial court granted summary judgment in favor of the defendants on all of the plaintiff's claims. The plaintiff now appeals. We reverse the grant of summary judgment as to the claims of

fraudulent inducement and violation of public policy, finding that genuine issues of material fact exist as to those claims. We affirm the trial court's decision on all remaining claims.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

William D. Leader, Jr.; Eugene N. Bulso, Jr.; and Taylor C. Sutherland, Nashville, Tennessee, for the appellant, Blackburn & McCune, PLLC

John S. Hicks and Brigid M. Carpenter, Nashville, Tennessee; and Brooke S. Murphy and Timila S. Rother, Oklahoma City, Oklahoma, for the appellees, Pre-Paid Legal Services, Inc., and Pre-Paid Legal Services of Tennessee, Inc.

## OPINION

### FACTS AND PROCEEDINGS BELOW

This is the second appeal in this case, despite the fact that the proceedings are still at the pretrial stage. *See Blackburn & McCune, PLLC v. Pre-Paid Legal Servs., Inc.*, No. M2006-01380-COA-R3-CV, 2007 WL 2409671 (Tenn. Ct. App. Aug. 24, 2007). This appeal presents issues related to fraud, public policy, and an issue of first impression under the filed rate doctrine. At the outset, some background information is helpful.

### *Pre-Paid Legal Expense Plans*

Defendant/Appellee Pre-Paid Legal Services, Inc. ("PPLSI"), is an Oklahoma corporation engaged in underwriting and marketing legal expense plans, also called legal service contracts or legal insurance. The plans have been sold to consumers throughout the United States and in four provinces of Canada since 1972. Consumers who purchase these plans are called "members." Under PPLSI's plans, members pay a monthly premium to PPLSI, and PPLSI in turn pays a "provider law firm" to provide members certain legal services defined in the plan. The services enumerated in the plans typically include telephone consultation, will preparation, traffic violation defense benefits, and IRS audit assistance at no cost beyond the monthly premiums. Legal services beyond those specified in the plans are available at a 25% discount from the provider attorney's regular hourly rate.

Of the forty-nine states in which PPLSI sells its legal expense plans, thirty-four do not consider the plans to be insurance products, and thus not subject to State regulation. In fifteen states, including Tennessee, the legal expense plans are considered to be insurance products, subject to state regulation.

The "provider law firms" who administer the services under the plans are selected and compensated by PPLSI in each state or geographic region. In February 1994, the predecessor to Plaintiff/Appellant Blackburn & McCune, PLLC ("Blackburn & McCune"),[1] became the official provider law firm for PPLSI's members in the State of Tennessee. Under this arrangement, Blackburn & McCune was compensated pursuant to an Attorney Provider Agreement, first executed with PPLSI in 1994. Under the Attorney Provider Agreement, Blackburn & McCune agreed to provide PPLSI's members with the specified legal services, and PPLSI agreed to pay the law firm a certain amount per member per month, regardless of whether any legal services were provided to members. The payments to the law firm are referred to as capitated payments, per capita payments, or retainers. Under the Attorney Provider Agreement, the amount of the capitated payment to the law firm can vary depending on the type of plan purchased by the member. In 1994, the agreed capitated payment to Blackburn & McCune was $4.50 for the basic family plan (Plan 242) and $7.50 per month for the expanded family plan (Plan 242OPT).[2] The Attorney Provider Agreement stated that it could be terminated by either Blackburn & McCune or by PPLSI for any reason, upon written notice.

### Approval by TDCI

In 1980, when PPLSI began selling its legal expense plans in Tennessee, Tennessee did not regulate the legal insurance business. This changed in 1990 upon the enactment of the Tennessee Legal Insurance Act, Tennessee Code Annotated § 56-43-101 *et seq*. ("the Act"). Under the Act, companies selling legal insurance plans in Tennessee are required to obtain a certificate of authority from the Tennessee Department of Commerce and Insurance ("TDCI"). T.C.A. § 56-43-104 (2008). In order to obtain a certificate of authority, the insurer must file with the State the legal insurance plans that are marketed and sold in the State and must receive approval of the plans from the TDCI. In addition, the insurer must file with TDCI "all rates, supplementary rate information, supporting information, policy

---

[1] The provider in 1994 was Blackburn, Slobey, Feeman, and Happell, founded by attorney Gary Blackburn. This firm subsequently became Blackburn & Slobey, PC, and later Blackburn & McCune, PC. Currently, the name of the firm is Blackburn & McCune, PLLC. In this Opinion, the phrase "Blackburn & McCune" is inclusive of all of these entities.

[2] Expanded plans include the provision of certain pretrial services for participating members.

forms, and endorsements." T.C.A. § 56-43-106(b); § 56-5-305(a). The TDCI must approve the rates in order for the insurance company to conduct its business.

For reasons not clear in the record, PPLSI did not immediately begin filing its legal insurance plans with the TDCI. In May 1997, the TDCI notified PPLSI that its legal insurance business was subject to regulation and oversight by the TDCI pursuant to the Act. PPLSI was informed that it had to obtain a certificate of authority from the State in order to market, sell, and service the pre-paid legal expense plans in Tennessee. The TDCI told PPLSI that it was required to file with the State all of the required documents and information concerning its rates, and to otherwise comply with TDCI's regulatory requirements.

After receiving the TDCI notification, in November 1997, PPLSI formed a subsidiary, Pre-Paid Legal Services of Tennessee, Inc. ("Pre-Paid of Tennessee"), for the purpose of applying for and obtaining a certificate of authority from the TDCI.[3] Accordingly, Pre-Paid of Tennessee prepared to file an application with the TDCI for a certificate of authority and for approval of its plan and its rates.[4] Meanwhile, PPLSI continued to do business in the State.

The TDCI disapproved of PPLSI continuing to do business in Tennessee without a certificate of authority, and sought to stop PPLSI's ongoing business activities. In February 1998, the TDCI issued an administrative consent order requiring PPLSI to "cease and desist from engaging in the business of legal insurance in the State of Tennessee" until it obtained a certificate of authority.[5] The order allowed PPLSI to continue servicing its current members, but it was not permitted to enter into new contracts for legal expense plans until it received a certificate of authority.

On March 20, 1998, Pre-Paid of Tennessee filed with the TDCI proposed forms and rates for four legal expense plans: 202 (basic), 202OPT (expanded); 242(basic), and 242OPT

---

[3]Pre-Paid of Tennessee is actually a subsidiary of Pre-Paid Legal Casualty, Inc., which itself is a wholly owned subsidiary of PPLSI. Although PPLSI and Pre-Paid of Tennessee are separate entities, they report to the Securities and Exchange Commission ("SEC") on a consolidated basis.

[4]The exact date on which Pre-Paid of Tennessee actually filed the application for a certificate of authority is unclear in the appellate record.

[5]In the consent order, the TDCI acknowledged that PPLSI had applied for a certificate of authority, but noted that the certificate had not yet been granted. PPLSI was required to pay past due premium taxes, along with penalties and interest, totaling about $175,000.

-4-

(expanded).[6] This filing reflected that members would pay premiums of $16 per month for the basic plans and $25 per month for the expanded plans.

The information submitted by Pre-Paid of Tennessee to the TDCI included a calculation of the "loss ratio" for its proposed plans, that is, the ratio of its claims expense to the premiums charged to its members. The loss ratio can be computed simply by dividing the "claims expense," which primarily consists of the amount paid to the provider law firm, by the premium to be charged. The proposed rates for the plans submitted by Pre-Paid of Tennessee reflected loss ratios of 28% to 31%, depending on whether the member chose an individual or group plan.

In early April 1998, representatives of the TDCI had conversations with counsel for Pre-Paid of Tennessee, Rob Ledyard, in which the TDCI apparently asked Pre-Paid of Tennessee to "justify" the proposed rates it had submitted to the TDCI. In particular, the TDCI's concerns appeared to relate to the loss ratio reflected in the filings submitted by Pre-Paid of Tennessee. In response, on April 20, 1998, Pre-Paid of Tennessee resubmitted the filings with further explanations intended to address the TDCI concerns about the proposed loss ratio. That same day, Pre-Paid of Tennessee received its certificate of authority from the TDCI. However, Pre-Paid of Tennessee did not receive approval from the TDCI of its proposed rates at that time.

By letter dated April 28, 1998, the TDCI informed Pre-Paid of Tennessee that its filings could not be approved. The TDCI requested that Pre-Paid of Tennessee "[p]lease provide justification for a claims expense below 45%," implying that the loss ratio expected by the TDCI was at least 45%, and stating that the Company's proposed loss ratio could not be "considered reasonable." The letter cautioned Pre-Paid of Tennessee that it could not issue new contracts or utilize the proposed rates without approval from the TDCI.

On the same day as the date on the TDCI letter, April 28, 1998, Pre-Paid of Tennessee sent revised rate filings to the TDCI. The revisions increased the "claims expense" component of the proposed rates, thereby resulting in a higher loss ratio. In a letter accompanying the revised filings, Pre-Paid of Tennessee explained to the TDCI that the new filings included "reworked expense exhibits." The "reworked" exhibits showed an increase in the claims expense amounts for all four types of insurance plans, based on two things. First, the claims

---

[6]Pre-Paid of Tennessee's March 20, 1998 letter of enclosure to the TDCI states: "Our Company has just been licensed to write legal service plan coverage in Tennessee." This would indicate that, as of the date of the letter, Pre-Paid of Tennessee had obtained a certificate of authority from the TDCI. However, a subsequent letter to the TDCI from counsel for Pre-Paid of Tennessee, dated April 14, 1998, indicates that the letter of enclosure was in error, that it had not yet received its certificate of authority.

expense amounts were increased by 10% of the premium, or $1.60 (basic) or $2.50 (expanded), based on a re-allocation of the company's general and administrative expenses. Second, the claims expense amounts were all increased by $1.40 per month, based on what Pre-Paid of Tennessee characterized as an "investment in efficiencies" in the provider law firm. According to the letter, Pre-Paid of Tennessee planned to "enter into . . . a contract with Tennessee provider attorney," and that "[t]he effect of this contract is to increase lawyer compensation by $1.40 per member per month . . . ." Pre-Paid of Tennessee told the TDCI that, because of the volume of business that would be given to the provider law firm, "the insurer's investment in reducing the lawyer's overhead is central to the plan's success." Considering these changes, the new proposed rate filings listed a claims expense of $7.50 per month for the basic plans, and $11.40 per month for the expanded plans. This increase in claims expense resulted in a proposed loss ratio for all plans of between 47% and 50%. The increase in the loss ratio would imply a corresponding decrease in the profits made by Pre-Paid of Tennessee on the premiums charged to members.

The next day, on April 29, 1998, Pre-Paid of Tennessee received its final form and rate approval from the TDCI. PPLSI then resumed exclusively marketing, selling, and issuing the Pre-Paid Legal Expense Plan contracts to members in Tennessee.[7]

### *The Administrative Services Agreement (ASA)*

On April 28, 1998, the same day that Pre-Paid of Tennessee sent the revised filings to the TDCI, PPLSI presented Blackburn & McCune with a proposed letter agreement called an Administrative Services Agreement ("ASA"). Under the ASA, PPLSI was to "provide certain administrative services" to the law firm, including:

> 1. Provide access to an automated software system developed by PPLSI for Blackburn & McCune to allow the firm to maintain computer records relating to the legal services provided to the PPLSI members;
>
> 2. Permit immediate retrieval of information entered into the system to increase office efficiency;
>
> 3. Provide real-time reporting capabilities available for the law firm to allow monitoring and evaluation of work in progress;

---

[7]In November 2003, the Attorney Provider Agreement was revised to substitute or add Pre-Paid of Tennessee as a party to the contract. However, the parties operated as if it had been so amended continuously from April 1998.

4.  Provide management report generating capabilities;

5.  Provide access to a programming staff available for on-going change management training and access to the PPLSI help desk.

In consideration for this, the ASA called for Blackburn & McCune to pay PPLSI $1.40 per member per month. This monthly payment was the same amount of the increase in provider payments the Company reported to the TDCI in its April 28, 1998 filing. The ASA letter agreement was signed by representatives of both PPLSI and Blackburn & McCune.

The disputed facts in this lawsuit revolve around significant representations made to Blackburn & McCune when it was asked to sign the ASA. Blackburn & McCune claims that Pre-Paid of Tennessee told members of the law firm that the agreement was required by the TDCI in order to establish a reserve to compensate other attorneys for work that could not be performed by Blackburn & McCune. Whatever the representations, Blackburn & McCune executed the ASA. Blackburn & McCune considered the ASA to be a condition of its continued employment as the provider law firm for Pre-Paid of Tennessee. The ASA was not disclosed to the TDCI.

As Pre-Paid of Tennessee had indicated to the TDCI, Pre-Paid of Tennessee began paying Blackburn & McCune increased compensation. The increase in compensation came to approximately $1.50 per member per month — or $6.00 (basic) and $9.00 (expanded) for its services under the legal expense plans.[8] At the same time, pursuant to the ASA, PPLSI required Blackburn & McCune to pay $1.40 per member per month to PPLSI. Considering the increase in compensation together with the fee charged to Blackburn & McCune under the ASA, this amounted to a net increase to Blackburn & McCune of 10 cents per month in the capitalized rate.[9] Some evidence in the record indicates that the administrative fee varied from plan to plan; while Pre-Paid of Tennessee charged Blackburn & McCune a capitated rate of $1.40 per month for most plans, it charged $3.50, $4.00, or $5.00 per month for others. These payments under the ASA totaled more than $2 million from 1998 through 2004.

---

[8]The payments were made to Blackburn & McCune from the parent company PPLSI on behalf of Pre-Paid of Tennessee, and Pre-Paid of Tennessee was charged this amount by PPLSI.

[9]From 1998 to 2004, PPLSI inadvertently billed Blackburn & McCune, and Blackburn & McCune paid, $1.50 per member per month under the ASA. When this was brought to PPLSI's attention, PPLSI allegedly reimbursed Blackburn & McCune.

Despite the flurry of activity in the spring of 1998, Blackburn & McCune did not go online with its recordkeeping for PPLSI business until January 2000. According to PPLSI and Pre-Paid of Tennessee, Blackburn & McCune had agreed to go online at the time the ASA was executed, but did not honor that agreement for over a year. Once Blackburn & McCune's recordkeeping was brought online, PPLSI and Pre-Paid of Tennessee claim, Blackburn & McCune "used and praised the software." Nevertheless, regardless of the reason for the delay, it appears that no purported computer or other administrative services were provided to Blackburn & McCune pursuant to the ASA until a year and a half after the ASA agreement was signed.

### *Challenges to the ASA*

In May 2004, Gary Blackburn ("Blackburn") of Blackburn & McCune assisted Rob Ledyard, counsel for Pre-Paid of Tennessee and PPLSI, in responding to a routine audit of Pre-Paid of Tennessee by the TDCI. Blackburn had executed the ASA on behalf of the Blackburn & McCune law firm. As part of the audit effort, Blackburn met with Ledyard and PPLSI's regulatory compliance officer Kathleen Pinson ("Pinson"). In the meeting, Blackburn talked with Pinson about the ASA. Blackburn contends that Pinson told him that the purpose of the ASA was to enable PPLSI to comply with the TDCI loss ratio requirements without suffering an actual loss. Blackburn indicated that he was surprised by this information, and claimed that he had never before been informed of this alleged purpose of the ASA or its relationship to the TDCI's loss ratio requirement. Blackburn was allegedly also told that the increased payments were reported to the TDCI, but that the payments from Blackburn & McCune under the ASA were not reported.

After this disclosure, Blackburn and the other members of his firm investigated the matter further. They found that PPLSI required all of its provider firms that had reached a certain level of membership – which Blackburn & McCune had reached – to handle their recordkeeping online. The law firm determined that the recordkeeping online capability provided by PPLSI under the ASA was offered to provider law firms in at least nine other states at no cost. The only other state in which the provider law firm was charged a capitated fee for this software was Texas, which coincidentally was the only other state with minimum loss ratio requirements for PPLSI to sell its legal insurance in the state.

In light of this information, Blackburn & McCune came to believe that the software which provided the online recordkeeping capabilities was part of PPLSI's normal overhead rather than a separate expense, and that the law firm had in effect received no compensable "administrative services" under the ASA. Blackburn & McCune surmised that the ASA was part of a scheme by which PPLSI could recoup the increased provider payments brought about by the TDCI's directive that it submit proposed rate and claims expense figures that

would result in a loss ratio of at least 45%. Blackburn & McCune suspected that the ASA was designed solely to circumvent the TDCI loss ratio requirement and protect PPLSI's excessive profits.

Correspondence and meetings ensued between PPLSI and Blackburn & McCune. The lawyer for Blackburn & McCune characterized the "administrative fees" as a "return" of the law firm's per capita fees, expressed discomfort at PPLSI's failure to report the arrangement to the TDCI, and indicated that their legal and ethical duties as lawyers required the firm to take action to correct the inaccurate reporting. PPLSI's counsel insisted that the fees paid by Blackburn & McCune pursuant to the ASA were legitimate administrative fees and not "returns" of the law firm's per capita fees. PPLSI maintained that its reporting to the TDCI was proper. Blackburn & McCune was insistent that disclosure to the TDCI was necessary. The parties discussed a joint disclosure, but were unable to agree on its content.

Ultimately, in a letter dated February 4, 2005, counsel for Blackburn & McCune, W. Davidson Broemel ("Broemel"), wrote a letter to the TDCI on behalf of Blackburn & McCune, reporting the facts that caused the firm to conclude that PPLSI and Pre-Paid of Tennessee had engaged in an improper scheme to circumvent the TDCI's loss ratio requirements. By reporting the increased payments to the provider law firm but omitting the administrative fees charged to the firm, Broemel stated, "[t]he result was to represent falsely that more money had been allocated to provide services to policyholders than was truly the case. The purpose plainly was to defeat the required loss ratio."

In April 2005, PPLSI sent its own letter to the TDCI, explaining the components of the ASA and how PPLSI arrived at the charge of $1.40 per member per month for the computer software services. PPLSI reassured the TDCI that the administrative fees paid by Blackburn & McCune were not a refund of the per capita payments but were contracted payments made for "good business reasons." PPLSI conjectured that Blackburn & McCune may have been operating under "a misapprehension of the loss ratio requirement."

In June 2005, Broemel received a telephone call from a TDCI representative, who told him that the TDCI would not take action on Blackburn & McCune's report. Neither Pre-Paid of Tennessee nor PPLSI were cited for statutory or regulatory violations based on the failure to report the funds received from Blackburn & McCune under the ASA.[10]

---

[10]Later TDCI reports showed that PPLSI did not actually meet the TDCI's loss ratio requirements in 1998, 1999, or 2000, but that from 2001 forward "the company then became compliant with that requirement."

Effective October 2005, PPLSI terminated Blackburn & McCune as its provider law firm under the Pre-Paid Legal Expense Plan.

In December 2006, PPLSI was examined by the TDCI as part of the TDCI's regular examination process. The TDCI made no adverse findings, comments, or requirements with respect to the loss ratios, the ASA, or the 1998 rate filing.

### *Proceedings Below*

On March 24, 2006, Blackburn & McCune filed the instant lawsuit against PPLSI and Pre-Paid of Tennessee (collectively referred to as "the Pre-Paid Defendants") in the Davidson County Chancery Court, seeking rescission of the ASA and return of the monies it paid under it. On April 7, 2006, Blackburn & McCune filed its first amended complaint, and on June 12, 2006 filed its second amended complaint, which is the operative pleading in this appeal. In its second amended complaint, Blackburn & McCune asserted claims for relief against the Pre-Paid Defendants premised upon the basic allegations that they induced Blackburn & McCune into entering the ASA through fraudulent misrepresentations, and that the ASA was void as against public policy because its purpose was to "get around" the TDCI loss ratio requirements. Blackburn & McCune sought a declaratory judgment, rescission of the ASA, and restitution of the fees it had paid. The theories of relief relied upon included (1) misrepresentation; (2) promissory fraud; (3) fraud in the inducement; (4) breach of fiduciary duty; (5) unjust enrichment; and (6) civil conspiracy.

On April 26, 2006, the Pre-Paid Defendants filed a motion to dismiss based on a variety of grounds, including the forum selection clause in the Attorney Provider Agreement designating Oklahoma as the forum. On May 15, 2006, the trial court granted the motion to dismiss based on the forum selection clause. Blackburn & McCune then filed the first appeal to this Court; the trial court's dismissal was reversed and the case was remanded for further proceedings. *See Blackburn & McCune*, 2007 WL 2409671, at *4.

On remand, the case was transferred to the Davidson County Circuit Court below.[11] Extensive discovery ensued.

The discovery included the deposition of Jim Freeman ("Freeman"), a lawyer who was a partner at Blackburn & McCune in 1998.[12] At that time, Freeman communicated on behalf of the law firm with the Pre-Paid entities. Specifically, Freeman had discussions with the

---

[11]The case was reassigned to Judge Amanda McClendon.

[12]Freeman left employment with Blackburn & McCune in March 2003.

representative of the Pre-Paid entities, Kathy Pinson, regarding the agreements at issue, and approval from the TDCI of the rates and plans of the Pre-Paid entities. From his conversations with Pinson and other representatives of the Pre-Paid entities, Freeman was given the impression that the Pre-Paid entities were required to set aside a reserve to pay lawyers outside of Blackburn & McCune, when necessary, and that this reserve requirement was to satisfy Tennessee regulatory authorities. Freeman conveyed this information to Blackburn & McCune partner Gary Blackburn. Blackburn & McCune understood that the reserve requirement was at least part of the rationale for the Pre-Paid entities' insistence that Blackburn & McCune execute the ASA.

Blackburn was deposed as well. In his deposition, Blackburn recalled discussing these matters with Freeman, but was unsure of the timing. The firm later filed an affidavit by Blackburn in which he asserted that he learned of the representations made by the Pre-Paid Defendants to Freeman prior to his execution of the ASA on behalf of the firm.

The discovery also included the deposition of a designated representative of the TDCI, Mark Jaquish ("Jaquish"), the TDCI"s Director of Financial Affairs. Jaquish was not involved in the investigation and did not make the decision on whether to take action in response to Blackburn & McCune's disclosure letter. To prepare for the deposition, he reviewed the TDCI's investigative files. Jaquish declined to testify as to the reasons for TDCI's decision not to take action; he would say only that he saw no indication in the TDCI's files that the Department had found a violation of statutes or rules. Jaquish testified that the TDCI concluded that the ASA was a "legitimate" contract.

On January 22, 2009, Blackburn & McCune filed a motion to amend its complaint to assert a claim under the filed rate doctrine, based on discovery indicating that PPLSI did not pay Blackburn & McCune the rates that had been filed with and approved by the TDCI. On this claim, Blackburn & McCune sought $2,922,342 in damages, the difference between the rates that PPLSI told to the TDCI that it would pay Blackburn & McCune and the actual amount that it paid.[13] Blackburn & McCune also sought punitive damages. The motion to amend was granted.

On January 23, 2009, in response to Blackburn & McCune's motion to amend its complaint, the Pre-Paid Defendants filed a motion to amend the answer to respond to the new filed rate doctrine claim, and to assert two counterclaims as well. Pre-Paid of Tennessee claimed that Blackburn & McCune owed it $24,517 for breach of certain provisions of the Attorney Provider Agreement, arguing that Blackburn & McCune was responsible for paying referral

---

[13]The amended complaint sought "in excess of $4 million" and punitive and other damages. This amount was later modified.

attorneys for their services provided to plan members and had failed to do so. PPLSI asserted a counterclaim for $2 million for restitution of the increased provider payments, in the event that the trial court found in favor of Blackburn & McCune in its claim that no contract for increased payments under the Attorney Provider Agreement existed during the relevant time period. The Pre-Paid Defendants' motion to amend was granted as well.

On March 25, 2009, the parties filed cross-motions for summary judgment. Blackburn & McCune moved for partial summary judgment, claiming that it was entitled to a judgment as a matter of law on its claim under the filed rate doctrine, as well as the Pre-Paid Defendants' two counterclaims. The Pre-Paid Defendants moved for summary judgment as to all of the claims raised by Blackburn & McCune in its amended complaint. The Pre-Paid Defendants also sought summary judgment on the two counterclaims.

On June 16, 2009, the trial court held a hearing on the parties' cross motions for summary judgment, at which counsel for the parties summarized and clarified their arguments. At the conclusion of the hearing, the trial court took the matter under advisement. Trial was scheduled for July 6, 2009.[14]

### *Trial Court Ruling*

On June 24, 2009, two weeks before the scheduled trial, the trial court issued a lengthy memorandum opinion ruling on the parties' summary judgment motions. The overall effect of the ruling was to dismiss all of the claims raised by the parties in the case.

The trial court first addressed Blackburn & McCune's motion for partial summary judgment. As to the Pre-Paid Defendants' two counterclaims, the trial court held that the Attorney Provider Agreement was a valid and binding agreement and that, therefore, the Pre-Paid Defendants were not entitled to the equitable remedy of rescission of the Attorney Provider Agreement and restitution. The trial court further held that the language in the Attorney Provider Agreement did not support the Pre-Paid Defendants' assertion that Blackburn & McCune was obligated to pay the referral attorneys, so summary judgment was granted in favor of Blackburn & McCune on that counterclaim as well.

The trial court next addressed the only claim on which both parties sought summary judgment, namely, Blackburn & McCune's claim based on the filed rate doctrine. The trial court granted summary judgment in favor of the Pre-Paid Defendants on this claim, reasoning that the doctrine was not intended to protect the relationship between the regulated entity and

---

[14]In preparation for trial, the parties filed several motions *in limine* for the trial court's consideration, objecting to the admissibility of certain witness testimony and various exhibits used in discovery.

its provider firm. The trial court further noted that, in any event, Blackburn & McCune's overall compensation remained the same after the filings with the TDCI as before the filings and, therefore, the firm suffered no injury. Thus, the trial court concluded that the filed rate doctrine did not apply in this situation, and it granted summary judgment in favor of the Pre-Paid Defendants on this claim.

The trial court also granted the Pre-Paid Defendants' motion for summary judgment as to all of the remaining claims in Blackburn & McCune's amended complaint. The trial court held that:

(1) the ASA is not illegal or void and does not violate public policy;

(2) the fraud/promissory fraud/declaratory judgment claim based upon fraud in the execution of the ASA must fail, because Blackburn & McCune could not "establish by *clear and convincing* evidence that Defendants made misrepresentations about the ASA before it was executed;"

(3) claims based on fraud by omission must fail, because no fiduciary relationship existed between Blackburn & McCune and the Pre-Paid Defendants, so "any facts omitted or not disclosed by Defendants regarding the ASA are not required to be disclosed by" the Pre-Paid Defendants;

(4) the Pre-Paid Defendants cannot be held liable for breach of a fiduciary duty, because no fiduciary relationship between the parties existed;

(5) claims based on fraudulent misrepresentations made to the TDCI must fail, because the filed rate doctrine does not apply;

(6) claims based on the Tennessee Legal Insurance Act, Tennessee Code Annotated § 56-43-101 *et seq.,* must be dismissed, because the Pre-Paid Defendants' rate filings occurred before the effective date of this statute;

(7) the claims of unjust enrichment must fail, because the parties operated under an existing and enforceable contract, the Attorney Provider Agreement; also, Blackburn & McCune's payments made under the ASA were offset by increased per capita payments, plus an additional 10 cents; therefore, the Pre-Paid Defendants were not unjustly enriched; and

(8) Equitable estoppel is an affirmative defense, and Blackburn & McCune may not use it offensively to create a right to additional compensation.

-13-

Thus, all of the parties' claims were dismissed. On the same day, the trial court entered orders granting the parties' motions for summary judgment as set forth above, and assessing costs. From these orders, Blackburn & McCune now appeals.[15]

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Blackburn & McCune argues overall that the trial court's reasoning in its grant of summary judgment in favor of the Pre-Paid Defendants "reveals a basic misunderstanding of the legal principles applicable to a motion under Rule 56," in that the trial court weighed evidence and determined the credibility of the witnesses. With respect to its claim regarding the validity of the ASA, Blackburn & McCune argues that the trial court made three critical mistakes: (1) it improperly dismissed the claim for fraudulent inducement based upon a lack of sufficient evidence; (2) it applied an incorrect legal standard and ignored the evidence that supported the claim that the ASA was void and unenforceable as against public policy; and (3) it improperly dismissed and/or disregarded Blackburn & McCune's claim that, even if the ASA were valid, the Pre-Paid Defendants charged and collected fees not due under the agreement. With respect to Blackburn & McCune's claim under the filed rate doctrine, the firm argues that the trial court erred in finding the doctrine inapplicable as a matter of law based on the undisputed facts.

We review a trial court's grant of summary judgment *de novo* on the record, affording no deference to the trial court's decision. ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The court "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." ***Byrd v. Hall***, 847 S.W.2d 208, 210-11 (Tenn. 1993).

For a motion for summary judgment to be granted, the moving party must submit evidence that negates an essential element of the non-moving party's claim, or affirmatively establish that the nonmovant cannot prove an element of its claim. ***Hannan v. Alltel Publ'g Co.***, 270 S.W.3d 1, 8-9 (Tenn. 2008). If the moving party does not satisfy this initial burden of production, the motion for summary judgment must be dismissed. ***Id.*** at 5; ***Byrd***, 847 S.W.2d at 210-11. If, however, the movant satisfies its burden of production, the burden shifts to the non-moving party to demonstrate how these requirements have not been met "(1) by pointing

---

[15]The Pre-Paid Defendants have not challenged on appeal the propriety of the trial court's grant of summary judgment in favor of Blackburn & McCune on its counterclaims.

-14-

to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) by rehabilitating evidence challenged by the moving party, (3) by producing additional evidence that creates a material factual dispute, or (4) by submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery." ***Pendleton v. Mills***, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001). At this stage, the non-movant's evidence is taken as true, and the trial judge is not to weigh the evidence. ***See McCarley v. West Quality Food Serv.***, 960 S.W.2d 585, 588 (Tenn. 1998). "Summary judgment procedure is not a substitute for trial. It is only when there is no disputed issue of material fact that a summary judgment should be granted. If such fact issue is present, the matter must not be resolved by a battle of affidavits, but must be resolved by a trial on the merits." ***Stone v. Hinds***, 541 S.W.2d 598, 599 (Tenn. Ct. App. 1976).

## ANALYSIS

## I. Validity of the ASA

Blackburn & McCune asserts that it is entitled to restitution of its payments made pursuant to the ASA on two bases: (1) the Pre-Paid Defendants fraudulently induced Blackburn & McCune to execute the ASA, and (2) the ASA is void and unenforceable as against public policy. Both theories are addressed below.

### *A. Fraudulent Inducement*

Blackburn & McCune argues that the trial court misapplied the standard for summary judgment in considering its fraudulent inducement claim. The Pre-Paid Defendants do not directly address this argument, but contend that, regardless, the fraudulent inducement claim must fail because Blackburn & McCune suffered no injury. We consider these in turn.

### 1. Summary Judgment Standard

We first address Blackburn & McCune's argument that the trial court improperly applied the summary judgment standard to its claims that the Pre-Paid Defendants fraudulently induced Blackburn & McCune into executing the ASA.

To sustain a claim of fraud in the inducement of a contract, a plaintiff must prove five elements: "(1) [the existence of] a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance." ***Lamb v. MegaFlight***, 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000); ***see also Biancheri v. Johnson***,

Nos. M2008-00599-COA-R3-CV & M2007-02861-COA-R3-CV, 2009 WL 723540, at *7 (Tenn. Ct. App. Mar. 18, 2009). On the fraudulent inducement claim, the trial court determined that Blackburn & McCune could not carry its burden of proving that false representations were made before the agreement was executed. The trial court explained its reasoning:

> Plaintiff cannot establish by *clear and convincing* evidence that Defendants made misrepresentations about the ASA before it was executed. The Court is not persuaded by the later-filed affidavit, Supplemental Affidavit of Gary Blackburn of May 15, 2006, to clarify a prior made deposition where Mr. Blackburn wavered about whether an affirmative misrepresentation was made to Plaintiff regarding the ASA *before* it was executed. The Court considers the amount of time that has passed since the agreement and Mr. Blackburn's testimony; however, to make a ruling in its favor, the Court must be persuaded wholeheartedly by the *clear and convincing* standard. The Court has not been so persuaded.
>
> The Court is more troubled with the substance of the misrepresentation in that Mr. Blackburn was told that the reason for the increased per capita rate was due to the requirement by the TDCI of a reserve being established. Still, the issue is whether Mr. Blackburn's representations are credible and whether Plaintiff was injured by these representations. As stated before, the Court finds Mr. Blackburn's testimony not particularly helpful because he is unable to recall the time the misrepresentation occurred. The Court is not comfortable making a ruling in its favor without such *clear and convincing* testimony. In addition, the Court finds it difficult to reconcile the fact that Blackburn and McCune, a reputable and experienced law firm, would not have known to inquire further about such reserves if it learned about the difference earlier on. The point is that Blackburn and McCune had some indication that the rate was different, even if it did not know why. The fact that Blackburn and McCune paid for administrative services it claimed to not receive from 1998 to 2000 is even more troubling. The Court finds it difficult to believe that Plaintiff would not have inquired about services they paid for but were not receiving. If there was misrepresentation, Blackburn and McCune was not as troubled by it then, as it seems to be now. The testimony regarding injury is simply not credible.

(Emphasis in original; footnotes and citation omitted). In a footnote to this excerpt, the trial court added that it required "[c]lear and convincing testimony without the benefit of a later, more recently filed affidavit." This was an apparent reference to Blackburn's affidavit which, in contrast to his deposition, stated that the alleged misrepresentations of the Pre-Paid Defendants occurred prior to his execution of the ASA. Thus, the trial court's holding

-16-

hinged primarily on the element of reliance. Finding a lack of credible evidence to establish this element of the claim of fraud in the inducement of the ASA, the trial court granted the Pre-Paid Defendants' motion for summary judgment on this claim.

On appeal, Blackburn & McCune argues that the trial court misapplied the applicable standard for ruling on a motion for summary judgment. Under the burden-shifting analysis applicable to motions for summary judgment, the moving party must show that there are no genuine issues of material fact for trial and that, on the undisputed facts, it is entitled to a judgment as a matter of law. *Byrd*, 847 S.W.2d at 214-15; *see Hannan*, 270 S.W.3d at 6. Once the moving party has met this burden of production, the burden then shifts to the nonmoving party to set forth specific facts, by using affidavits or other discovery materials, establishing that there are indeed disputed, material facts creating a genuine issue that needs to be resolved by the trier of fact. At this stage in the analysis, "[t]he evidence offered by the nonmoving party must be taken as true." *Byrd*, 847 S.W.2d at 215. "Moreover, the facts on which the nonmovant relies must be admissible at the trial but need not be in admissible form as presented in the motion (otherwise an affidavit, for example, would be excluded as hearsay)." *Id.* at 215-16. This burden-shifting analysis is intended to identify and resolve controlling issues of law, not issues of fact. Thus, "when the credibility of witnesses is an integral part of the factual proof, or when evidence must be weighed, a trial is necessary because such issues are not appropriately resolved on the basis of affidavits." *Id.* at 216.

Blackburn & McCune argues first that the Pre-Paid Defendants did not carry the burden of production to negate an element of its claim. Even if the defendants had met their burden of production, Blackburn & McCune argues, the law firm carried its burden of showing the existence of a genuine issue of material fact by pointing to evidence present in the record, and also by producing additional evidence, to establish the element of reliance. Specifically, Blackburn & McCune relies on its responses to interrogatories and the deposition testimony and affidavits of Gary Blackburn and Jim Freeman. It argues that the trial court impermissibly weighed the evidence and evaluated Blackburn's credibility, even applying a clear and convincing standard to its evaluation of the evidence. Blackburn & McCune argues that the trial court should have viewed this evidence in a light most favorable to the non-movant, and it should have concluded that a genuine issue of material fact existed for trial.

We agree. In its Memorandum Opinion, the trial court explicitly evaluated the credibility of Blackburn's testimony, stating that "the issue is whether Mr. Blackburn's representations are credible" and commenting that it was not "persuaded" by Blackburn's affidavit. While the credibility of Blackburn's testimony will certainly be an issue at trial, evaluating his credibility in the context of a summary judgment motion is clear error. When faced with a

summary judgment motion, the trial court must take the evidence offered by the nonmovant as true. *Id.* at 215. The trial court below failed to do so.

Moreover, the trial court appeared to, in effect, set aside Blackburn's affidavit that was filed after his deposition testimony. In his deposition, Blackburn could not recall the timing of the alleged misrepresentations by representatives of the Pre-Paid Defendants; in particular, he could not recall if their representations were made before he executed the ASA on behalf of Blackburn & McCune. In his later affidavit, however, Blackburn stated affirmatively that the alleged misrepresentations were made before the ASA was signed.

It is unclear whether the trial court was, in effect, applying the "cancellation rule" under which "contradictory statements of a witness in connection with the same fact have the result of 'cancelling each other out.' " *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482-83 (Tenn. Ct. App. 1978). Under those circumstances, the witness's testimony on that fact may be disregarded. However, in this case, although these two accounts by Blackburn are different, they are not necessarily contradictory. *See Church v. Perales*, 39 S.W.3d 149, 170 (Tenn. Ct. App. 2000) (stating that, at the summary judgment stage, contradictory evidence by one witness must be viewed in a light most favorable to the nonmovant). Therefore, we do not apply the "cancellation rule," whereby one witness's two contradictory statements cancel each other out, leaving no evidence at all on the topic. *See Helderman v. Smolin*, 179 S.W.3d 493, 501-02 (Tenn. Ct. App. 2005). Consequently, to the extent that the trial court disregarded Blackburn's affidavit testimony, we find that this was error.

In its Memorandum Opinion, the trial court referred repeatedly to the "clear and convincing" standard of proof, stating that, to rule in favor of Blackburn & McCune, "the Court must be persuaded wholeheartedly by the *clear and convincing* standard." (Emphasis in original). We assume that this is a reference to the general rule that fraud is not presumed, and each element of fraud must be established by clear and convincing evidence. *See* 37 AM.JUR.2D *Fraud and Deceit* § 471 (2001); *see Homestead Group, LLC v. Bank of Tenn.*, 307 S.W.3d 746, 751 (Tenn. Ct. App. 2009) ("Fraud is never presumed, and where it is alleged facts sustaining it must be clearly made out.").

Even assuming that Blackburn & McCune will bear the burden at trial of proving fraudulent inducement by clear and convincing evidence, this does not mean that, at the summary judgment stage, the trial court is to evaluate the credibility of the law firm's witnesses, to determine if their testimony is "convincing." Regardless of whether the ultimate standard of proof at trial is clear and convincing, at the summary judgment stage, the evidence must be viewed in a light most favorable to the non-movant. This Court has explained:

> The court . . . erroneously applied the standard to be used at trial rather than the criteria applicable to a summary judgment motion. First, on a summary judgment motion, the burden is not on the Administratrix to "prove" punitive damages or to prove such damages "by clear and convincing evidence," as the court and the Defendants assert. Under a long line of Supreme Court cases culminating in ***Hannan***, the burden is on the Defendants to either negate an element of a claim for punitive damages or to show "that the nonmoving party cannot prove an essential element of the claim at trial." ***Hannan***, 270 S.W.3d at *8-9. In a summary judgment motion it is the moving party, not the nonmovant, who has the burden of persuasion. ***Byrd***, 847 S.W.2d at 215.

***Estate of French v. Stratford House***, No. E2008-00539-COA-R3-CV, 2009 WL 211898, at *11 (Tenn. Ct. App. Jan. 29, 2009). Accordingly, because the trial court failed to apply the appropriate standard, its grant of summary judgment on this basis was error.

## 2. Reliance

"[I]t is rare for summary judgment to be appropriate when considering an issue of fraud." ***Efird v. Clinic of Plastic and Reconstructive Surgery, P.A.***, 147 S.W.3d 208, 222 (Tenn. Ct. App. 2003). From our review of the evidence proffered by Blackburn & McCune, we find that it is sufficient to create a disputed issue of fact on the reliance element of the law firm's fraudulent inducement claim. Freeman testified that, when PPLSI learned in 1998 that Tennessee had classified legal insurance as an insurance product subject to State regulation, he had several discussions with Pinson and other representatives of the Pre-Paid Defendants about the need to obtain TDCI approval of their plans. The Pre-Paid Defendants presented the ASA to Freeman, as Blackburn & McCune's representative, accompanied by an explanation that at least part of the monies the firm would pay the Pre-Paid Defendants under the ASA would go to create a reserve to pay outside attorneys. Freeman maintained that Pinson told him, in effect, that the reserve, and thus the ASA, was to satisfy Tennessee regulatory requirements. Freeman said that he conveyed these representations to Blackburn, and the firm executed the ASA to keep the high-volume business it got from PPLSI.

In his deposition, Blackburn recalled Freeman transmitting PPLSI's representations to him, but could not recall whether they were conveyed before or after he signed the ASA on behalf of the firm. However, in his affidavit executed six months later, Blackburn stated that the information was conveyed to him before he executed the ASA.

Blackburn & McCune allege that the Pre-Paid Defendants represented to them that the ASA was a bona fide contract for administrative services, mandated in part by the TDCI "reserve" requirements. In fact, the firm claims, the contract was a sham — a vehicle for the Pre-Paid

Defendants to "get around" the TDCI's loss ratio requirement and to recoup the loss of profits that resulted from the forced increase in per capita payments to the firm. This misrepresentation of the real purpose of the contract, the firm argues, fraudulently induced it into signing the contract.

We find that the evidence submitted by Blackburn & McCune, when taken as true and viewed in a light most favorable to the law firm, is sufficient to create a genuine issue of material fact on the reliance element of Blackburn & McCune's claim of fraudulent inducement. Therefore, we reverse the trial court's finding that there was no genuine issue of fact as to this element of the claim.

### 3. Injury

The Pre-Paid Defendants claim that, regardless of whether there is a genuine issue of fact on reliance, they are entitled to summary judgment on Blackburn & McCune's fraudulent inducement claim because Blackburn & McCune cannot show that it suffered any injury from the ASA. The Pre-Paid Defendants note the undisputed fact that, after the ASA was signed, Blackburn & McCune paid the Pre-Paid Defendants $1.40 per member per month, and at the same time the Pre-Paid Defendants increased the per capita payments to Blackburn & McCune by $1.50 per member per month. This resulted in a net increase to Blackburn & McCune of 10 cents per member per month. The Pre-Paid Defendants claim that the law firm "received more than it paid to allow it to purchase the ASA services, which amounts undisputedly would not have been paid but for the ASA." Therefore, because the element of injury cannot be proved, they argue, this Court may affirm the grant of summary judgment in favor of the Pre-Paid Defendants on that basis.

The trial court appeared to rely in part on lack of injury to Blackburn & McCune in its grant of summary judgment in favor of the Pre-Paid Defendants. In its Memorandum Opinion, the trial court stated that "the issue is . . . whether Plaintiff was injured by these representations" by the Pre-Paid Defendants, and concluded that Blackburn & McCune's "testimony regarding injury is simply not credible." Regardless of whether the trial court granted summary judgment in favor of the Pre-Paid Defendants by relying in part on its finding that Blackburn & McCune was not injured by the alleged misrepresentations, we may affirm the trial court's decision based on grounds differing from those which were the basis for the trial court's decision. *See Newman v. Woodward*, 288 S.W.3d 862, 869 n.2 (Tenn. Ct. App. 2008) (citing *Hill v. Lamberth*, 73 S.W.3d 131, 136 (Tenn. Ct. App. 2001)).

Nevertheless, we are not persuaded that the Pre-Paid Defendants are entitled to summary judgment on this basis. Blackburn & McCune claims that, but for the fraudulent inducement, the firm would not have executed the ASA and would have received the *full increase* in

provider payments without having to "refund" this money to the Pre-Paid Defendants under the ASA. In response, the Pre-Paid Defendants submitted evidence that Blackburn & McCune would not have received the $1.50 increase in provider payments *but for* the ASA.

However, other evidence indicates that the increased provider payments were necessary to achieve the 45% loss ratio required by the TDCI. In his affidavit, Freeman described the effect on PPLSI of the consent order requiring PPLSI to cease marketing new legal insurance plans until it received TDCI approval. He testified that, in April 1998:

> [PPLSI] had been essentially shutdown in its sales and marketing of individual new membership in the State of Tennessee because the [TDCI] had become concerned about whether [PPLSI] was an insurance entity subject to its regulatory authority. This shutdown was having a severe impact on the [PPLSI] sales force in Tennessee.

In his deposition, Freeman described the state of mind of the Tennessee PPLSI sales personnel:

> They were vocal and they were panicked. They were frantic. Many of them had made substantial investments to reserve office space to house their operations. They had hired clerical people to support their operations. They were having to fire and lay off, terminate people that they had committed to. They were seeing very capable salespeople that they had hired go off into other sales ventures and so, you know, many of them were seeing what they had planned as their future for the foreseeable, you know, future disintegrating on them.
>
> * * *
>
> [T]hey had to come to some sort of a conclusion with the regulatory authorities that would enable them to get back into the business of selling if they were going to resolve the situation.

Thus, PPLSI was motivated to quickly resolve the TDCI's insistence that its plans have at least a 45% loss ratio. As described by this Court in the prior appeal:

> All of Pre-Paid's paid losses and paid loss expenses in Tennessee consisted of payments made by Pre-Paid to its Tennessee provider law firm, Blackburn & McCune. As a result, the only way it could comply with the . . . loss and loss expense ratio was to reduce premiums or increase the amounts it paid pursuant to the Attorney Provider Agreement.

-21-

***Blackburn & McCune***, 2007 WL 2409671, at *1. Of course, actual compliance with the TDCI's required loss ratio would have resulted in diminished profits, either by reduced premiums or increased claim expenses. Consequently, Blackburn & McCune alleges, the Pre-Paid Defendants "increased the payments to Blackburn & McCune for services rendered" and then "devised a scheme to recoup the increased payments," namely, the ASA. ***Id.*** at *1-2. Blackburn & McCune asserts that, had it been told that the ASA was a subterfuge to appear to comply with the loss ratio without actually incurring increased claims expenses, and had Blackburn & McCune been told that "it would have received the administrative and software services described in the [ASA] without making the additional payments set out in the agreement," the firm would not have signed the ASA. In that event, Blackburn & McCune asserts, the Pre-Paid Defendants would have been required to *actually* increase the claims expenses in order to achieve the TDCI's target loss ratio. Thus, the firm argues, it would have received the increased provider compensation without having to make the offsetting payments back to the Pre-Paid Defendants under the ASA.[16]

Whether the Pre-Paid Defendants actually would have made the increased provider payments to Blackburn & McCune absent the ASA is an issue of fact for trial. In considering the Pre-Paid Defendants' motion for summary judgment, we must construe the evidence in the light most favorable to Blackburn & McCune. In light of this record, we must reject the Pre-Paid Defendants' claim that they are entitled to summary judgment because Blackburn & McCune cannot show that it suffered injury from the alleged fraudulent conduct.

### B. Public Policy

Blackburn & McCune also argues that the trial court erred in granting summary judgment in favor of the Pre-Paid Defendants as to the law firm's claim that the ASA was void and unenforceable as against public policy. The trial court held:

> The Court does not find the ASA between Blackburn and McCune and Pre-Paid is illegal or void because the ASA does not violate public policy or the public interest. The Plaintiff cannot clearly show a prejudice to the public interest as defined by the supporting case law, ***Sanders v. Sanders***, 288 S.W.2d 473, 479 (Tenn. Ct. App. 1955). The Court is persuaded by the fact that the TDCI did not find that Defendant committed any regulatory violations and that it considered the ASA to be a bona fide contract. The Court finds the representative of TDCI's, Mr. [Mark] Jaquish, testimony to be credible and persuasive as to its actions, or non-actions, against Defendants.

---

[16]The Pre-Paid Defendants submitted the affidavit of Kathleen Pinson stating that provider compensation to Blackburn & McCune would not have been increased had the law firm not agreed to the ASA.

## 1. Summary Judgment Standard

Blackburn & McCune argues that the trial court again impermissibly weighed the evidence and assessed the credibility of the witnesses in granting the defendants summary judgment on this claim. The law firm maintains that sufficient evidence was submitted to create a genuine issue of material fact as to whether the purpose of the ASA was to circumvent the TDCI loss ratio requirement. Blackburn & McCune submitted evidence that (1) the administrative fee under the ASA is precisely equal to the increased claims expense required to meet the TDCI's loss ratio requirement, and to the increased provider compensation that was paid to Blackburn & McCune; (2) PPLSI used the same scheme in Texas to avoid the loss ratio requirement in that state; (3) Blackburn & McCune received no services upon execution of the agreement; (4) the administrative fee under the ASA varied from plan to plan in the amount needed to achieve the desired loss ratio for each plan; (5) the defendants required the law firm to acquire the services under the ASA; (6) no other provider firm (except in Texas, the only other state with loss ratio requirements) has ever paid for the services that were supposedly provided pursuant to the ASA; and (7) no documentation exists to support the amount of the fee charged under the ASA.[17] Blackburn & McCune claims that the trial court erroneously gave controlling weight to the deposition testimony of Mark Jaquish, the TDCI's designee on the subject. Even if the trial court were permitted to make credibility determinations, Blackburn & McCune argues, it should have determined that Jaquish was not credible because he lacked personal knowledge of the TDCI's investigation. Therefore, Blackburn & McCune insists sufficient evidence was submitted to create a genuine issue of fact for trial on the purpose of the ASA.

Blackburn & McCune also argues that the trial court's holding was erroneous as a matter of law. Initially, it maintains that the trial court improperly imposed upon Blackburn & McCune the burden to show that the violation of public policy in the contract that was "free from doubt," as that standard is applied in *Sanders*. *See Sanders*, 288 S.W.2d at 477 (quoting *Stansell v. Roach*, 246 S.W. 520 (Tenn. 1923)). Rather, Blackburn & McCune argues, this case is governed by the standard in *Freeman v. Thompson*, in which the court held that an agreement will be set aside as against public policy if a preponderance of the evidence shows that the purpose of the agreement was to circumvent Tennessee's insurance regulations. *See Freeman v. Thompson*, 600 S.W.2d 234, 236 (Tenn. Ct. App. 1979).

---

[17]In 2005, the Pre-Paid Defendants' attorney, Rob Ledyard, wrote a letter to the TDCI responding to Blackburn & McCune's letter to the TDCI disclosing their perception of the purpose of the ASA arrangement. Ledyard's letter included an attachment containing the Pre-Paid Defendants' "current recollection of the thought process that PPLSI used in arriving at the 1998 estimate of a $1.40 per member per month administrative fee that was used in the [ASA]."

In response, the Pre-Paid Defendants maintain that the trial court was correct in holding that, in order to find that a contract is void as against public policy, the public policy violation must be "free from doubt, and a prejudice to the public interest must clearly appear" as set out in *Sanders*. They note that, after the TDCI was fully informed of the arrangement under the ASA, it reviewed the Pre-Paid Defendants' business and, after doing so, never sanctioned the Pre-Paid Defendants, made any adverse factual findings, or in any other way indicated disapproval of the ASA as it related to the required loss ratios. The evidence that the TDCI chose not to take any adverse action against the Pre-Paid Defendants, they argue, prevents a finding that the ASA is against the policy of the regulating body, and therefore the ASA cannot be deemed to be violative of public policy. Certainly, under these circumstances, they argue, Blackburn & McCune cannot show that the alleged public policy violation is "free from doubt." Thus, the defendants argue that they are entitled to summary judgment on Blackburn & McCune's claim that the ASA is void as against public policy.

In general, parties are free to contract as they wish. However, it has long been held that Tennessee courts "will not enforce obligations arising out of a contract or transaction that is illegal." *Ledbetter v. Townsend*, 15 S.W.3d 462, 464 (Tenn. Ct. App. 1999); *see Reaves Lumber Co. v. Cain-Hurley Lumber Co.*, 279 S.W. 257, 258 (Tenn. 1926) (a court will not "allow itself to be made the instrument of enforcing obligations alleged to arise out of a contract or transaction which is illegal" (quotation omitted)). In modern legal parlance, the term "illegality" has been replaced by "unenforceability on the grounds of public policy." The meaning, however, is essentially the same. *Mattox v. Loretto Fin. Servs.*, No. 01A01-9307-CV-00308, 1994 WL 698046, at *5 n.3 (Tenn. Ct. App. Dec. 14, 1994) (citing RESTATEMENT (SECOND) OF CONTRACTS Ch. 8, Topic 1, Introductory Note (1979)). As noted by one commentator, "[t]he Restatement Second no longer speaks in terms of illegal bargains, preferring instead to focus on whether a promise or term in an agreement is unenforceable on grounds of public policy." 5 RICHARD A. LORD, WILLISTON ON CONTRACTS § 12:4 (4th ed. updated May 2010) (emphasis added).

A contract will be deemed unenforceable as against public policy if it "tends to harm the public good or conflict with Tennessee's constitution, laws or judicial decisions." *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 465 (Tenn. Ct. App. 2009) (citing *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 530 (Tenn. 1991)). A contract may also be deemed unenforceable "[i]f the *purpose* underlying the agreement contravenes public policy." *Id.* (emphasis added); *see Freeman*, 600 S.W.2d at 236 (finding that a contract was "tainted with illegality" because it was part of an overall scheme to avoid Tennessee's anti-rebate statute); *Mattox*, 1994 WL 698046, at *6 (finding that the purpose of contract was to avoid the statutorily required forfeiture of a vehicle used to transport stolen property); *Home Beneficial Ass'n v. White*, 177 S.W.2d at 545, 546 (Tenn. 1944) (finding that contracts supported by election to public office as consideration are illegal as against public interest);

-24-

*see also Holt v. Holt*, 751 S.W.2d 426, 428 (Tenn. Ct. App. 1988) ("A contract may not be held invalid as against public policy unless some public detriment will probably result, or unless the object of the contract has a tendency to injure the public." (citation omitted). *See also* 8 RICHARD A. LORD, WILLISTON ON CONTRACTS § 19:11 (4th ed. updated May 2010) (recognizing that, when an apparently legal contract is connected with an illegal scheme or plan, it may be rendered void as against public policy).

As a general matter, the issue of whether the purpose of a contract violates public policy is a question of law to be determined by the courts. *See Vintage*, 309 S.W.3d at 464 (citing *Mattox*, 1994 WL 698046, at *2 (citing 5 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 12:1 (5th ed.1993)). However, where a party alleges that an apparently legal contract was contrived for an illegal purpose, the determination of the actual purpose of the contract is an issue of fact. *See Freeman*, 600 S.W.2d at 236 (noting that the preponderance of the evidence supports a finding that the purpose of the contract at issue was to perpetuate an illegal scheme to circumvent the anti-rebate laws). When the purpose of the contract is alleged to violate public policy, the actual purpose of the contract must first be addressed, considering the situation of the parties at the time the contract was made. *See Vintage*, 309 S.W.3d at 465 (citing *Hoyt v. Hoyt*, 371 S.W.2d 300, 303 (Tenn. 1963)).

Although the trial court's holding is not entirely clear, it appears that it found that, in light of the testimony of TDCI representative Mark Jaquish, Blackburn & McCune could not establish that the purpose of the ASA was to circumvent the TDCI's loss ratio requirement. The trial court also cited this Court's decision in *Sanders v. Sanders*, 288 S.W.2d 473, 479 (Tenn. Ct. App. 1955), as the standard for determining whether the purpose of the contract violates public policy.

As to the actual purpose of the contract, the trial court again referred to the credibility of the deposition testimony submitted in connection with the parties' summary judgment motions, stating that it found Jaquish's testimony to be "credible." As emphasized above, the credibility of the witnesses is not assessed in considering a summary judgment motion; rather, the non-movant's evidence is taken as true, and the trial judge is not to weigh the evidence. *McCarley*, 960 S.W.2d at 588.

Nevertheless, on the issues it addresses, Jaquish's testimony is not disputed in the record. We must consider, then, whether Jaquish's testimony negates an element of Blackburn & McCune's claim or affirmatively establishes that the law firm cannot prove an element of its claim. *Hannan*, 270 S.W.3d at 8-9.

We examine first whether there is a genuine issue of fact as to the actual purpose of the contract; *i.e.* whether Jaquish's testimony establishes that Blackburn & McCune cannot prove

that the purpose of the ASA was to circumvent the TDCI's loss ratio requirement. If there is a genuine issue of fact as to the actual purpose of the ASA, we will address the legal question of whether that alleged purpose violates public policy, and whether the contract is rendered unenforceable.

## 2. Issue of Fact – Actual Purpose

In addressing the issue of the ASA's actual purpose, we must consider the situation of the parties at the time the contract was made. *See Vintage*, 309 S.W.3d at 465. At the time the ASA was executed, the parties had had an ongoing business relationship for some time. They dispute the content of their discussions of the purpose of the contract before it was presented to Blackburn & McCune. Years later, when Kathleen Pinson told Gary Blackburn that the purpose of the contract was to enable PPLSI to comply with the TDCI loss ratio requirement, he was unaware of this purpose and felt that it was not ethical to withhold information from the TDCI.

The evidence in the record indicates that, on February 4, 2005, Blackburn & McCune's attorney, David Broemel, sent his letter to the TDCI, disclosing the ASA to the TDCI and stating the law firm's belief as to its real purpose. The Pre-Paid Defendants sent an explanatory letter to the TDCI, dated April 26, 2005. The record also contains Broemel's handwritten note, written in June 2005, memorializing his telephone conversation with a TDCI representative, in which Broemel was apparently told that the TDCI had decided to take no action against the Pre-Paid Defendants in response to Broemel's letter.[18] Further, the record includes the December 31, 2006 TDCI report of its examination of Pre-Paid of Tennessee, which shows the results of a routine examination of the company's assets and liabilities, its capital, its management, and its corporate records. It does not allude to the matters raised in Broemel's letter.[19]

The trial court relied on Jaquish's testimony that the ASA was a "bona fide" contract in determining that the contract did not have an illegal purpose. At the time of his deposition, Jaquish was the TDCI's Director of Financial Affairs, and he was designated as the TDCI's representative for the deposition. In this capacity, Jaquish explained that the TDCI has "a range of loss ratios that are required for these types of products," depending on various factors. In order to meet the loss ratio that the TDCI had established for the Pre-Paid

---

[18]Broemel's handwritten notes on the conversation state that the TDCI was "not concerned" that legal insurance policyholders may have been "charged excessive amounts."

[19]The deposition testimony of TDCI representative Mark Jaquish indicated that the matters raised in Broemel's letter were not addressed in the TDCI's December 2006 examination.

Defendants' legal insurance, Jaquish said, "essentially either claims [expense] would have had to go up or premium would have come down." Jaquish was unaware of the Pre-Paid Defendants' dealings with any company outside Tennessee, and in particular was unaware of any of the Pre-Paid Defendants' activities in Texas.

Jaquish testified that he was not involved in the TDCI's response to Broemel's 2005 letter and had not conducted any field examination of the Pre-Paid Defendants; he had only reviewed the TDCI files and reports. Jaquish was repeatedly instructed by the TDCI's attorney not to answer questions about what the TDCI did to investigate the claims in Broemel's letter or the reasons for the TDCI's decision not to take action against the Pre-Paid Defendants.[20] Jaquish would say only that he had "seen nothing in the files that would indicate a determination was made that there was a violation of the statutes or the rules." He also confirmed that, according to the TDCI records, there was "not ever a formal investigation so to say" into whether the ASA was a bona fide agreement. He clarified that the subject of the ASA, the "administrative fees of a provider," are not within the scope of the TDCI's regulations and would not be covered by the department's financial examination of an insurance company. From his review of the TDCI records, he surmised that the TDCI "reviewed" the compensation that the Pre-Paid Defendants paid to Blackburn & McCune, and "recognized the fact that [Blackburn & McCune] also had an agreement with [PPLSI] for the provision of certain other administrative services." Within all of these parameters, Jaquish said that the TDCI "felt [that the ASA] was a legitimate contract and there were actual services being provided."[21]

Does this evidence negate an element of Blackburn & McCune's claim or establish that the law firm cannot prove that the purpose of the ASA was to circumvent the loss ratio requirement? We think not. The agency's investigation and the result of its investigation are certainly relevant, but they do not preclude a contrary finding of fact as to the actual purpose of the ASA in this case.[22] Moreover, Jaquish's testimony is far from illuminating. To an extent, it could be inferred from his testimony that the TDCI made a "finding" that the ASA was "legitimate" in the sense that services were rendered to Blackburn & McCune. However, given the apparent circumscribed nature of the TDCI's investigation, this begs the question. There is no dispute that Blackburn & McCune actually received recordkeeping

---

[20]The reason given for the TDCI attorney's instructions not to answer was "to protect [TDCI's] deliberative process."

[21]Elsewhere in his testimony, Jaquish added the qualifier "probably" to this statement.

[22]We note that this is not a judicial review of an administrative proceeding, in which the court would be required to defer to the administrative agency's decision. *Wayne County v. Tenn. Solid Waste Disposal*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988).

software services from the Pre-Paid Defendants. The gist of Blackburn & McCune's argument is that its contractual arrangement with the Pre-Paid Defendants must be compared with PPLSI's practices in other states; the same "administrative services" are given to providers free of charge in every other state except Texas, the only other state with a loss ratio requirement such as Tennessee's. Despite this, Jaquish's testimony indicates that the TDCI did not look into the Pre-Paid Defendants' dealings outside Tennessee, and specifically was not aware of the Pre-Paid Defendants' arrangements in Texas.

It could be argued that Jaquish's testimony and the TDCI finding of "no violation" after their examinations shows that the TDCI made a determination that the Pre-Paid Defendants had not violated any statute or regulation.[23] However, as Blackburn & McCune asserts, other evidence shows that the Pre-Paid Defendants' compliance with TDCI loss ratio requirement was an illusion created by the Pre-Paid Defendants, because they increased the claims expense but recouped this expense through the ASA. There was virtually no evidence of the details of the TDCI's investigation that yielded the purported finding of "no violation." This alleged finding was apparently premised on its conclusion that the ASA was a legitimate contract. Any such finding, however, was subject to the limitations, discussed above, that resulted from the circumscribed nature of the TDCI's investigation. Consequently, the TDCI's decision not to take adverse action against the Pre-Paid Defendants is merely one factor to be considered in determining whether the ASA had a legitimate purpose.

We must conclude that neither the TDCI's decision not to take adverse action nor the testimony of its representative, Jaquish, negates any element of Blackburn & McCune's claim or establishes that Blackburn & McCune cannot prove that the purpose of the ASA was to evade the TDCI's loss ratio requirement. Although the ASA purports to be an agreement for the provision of administrative services, Blackburn & McCune submitted evidence showing that the services provided under the agreement are available free of charge to provider firms in other states, in which legal insurance plans are not subject to loss ratio requirements. From this, it can be inferred that the ASA was contrived by the defendants solely (or at least primarily) to recoup the losses caused by the TDCI loss ratio requirement. The fact that Texas is the only other state in which the defendants charge the provider law firm a fee for these administrative services, and it is also the only other state with a minimum loss ratio requirement, bolsters the inference Blackburn & McCune seeks to draw on this issue. Under these circumstances, we find that sufficient evidence exists in this record to create a genuine issue of fact as to whether the Pre-Paid Defendants' true purpose for the ASA was to circumvent the TDCI loss ratio requirements.

---

[23] Jaquish testified only that he had seen nothing in the files indicating that the TDCI had found such a violation. We assume for purposes of argument, but do not find, that an affirmative finding by the TDCI may reasonably be inferred from this testimony.

## 3. Question of Law – Public Policy Violation

Although we have found that the evidence is sufficient to create a fact issue as to the Pre-Paid Defendants' purpose behind the ASA, we must also determine whether this disputed issue of fact is material to the motion for summary judgment. If the Defendants' purpose to "get around" the TDCI loss ratio requirement does not violate the public policy of Tennessee, then the Pre-Paid Defendants are entitled to summary judgment on this claim.

In considering this issue, we note that the trial court found that Blackburn & McCune "cannot clearly show a prejudice to the public interest as defined by the supporting case law. *Sanders v. Sanders*, 288 S.W.2d 473, 479 (Tenn. Ct. App. 1955)." The Pre-Paid Defendants likewise stress the *Sanders* case on appeal, particularly the statement in *Sanders* that "[c]ourts will not declare contracts void on grounds of public policy *except in cases free from doubt*, and a prejudice to the public interest must clearly appear." *Id.* at 479 (quoting *Stansell v. Roach*, 246 S.W. 520, 522 (Tenn.1923) (emphasis added)).

The *Sanders* case involved an antenuptial agreement, with public policy considerations that differ greatly from the contracts in the case at bar. Insurance policies, unlike typical contracts, are not purely private agreements, but affect the public generally. *See Alcazar v. Hayes*, 982 S.W.2d 845, 853 n.6 (Tenn. 1998) (citing *North River Ins. Co. v. Johnson*, 757 S.W.2d 334, 335 (Tenn. Ct. App. 1988)). Subsequent citation of *Sanders* as authority has occurred primarily in cases which also involved antenuptial agreements, for the proposition that such agreements are favored by public policy. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 597, 600 (Tenn. 2004); *Atkins v. Atkins*, 105 S.W.3d 591, 594 (Tenn. Ct. App. 2002). None have quoted the "free from doubt" standard advocated by the Pre-Paid Defendants.

There is little in the law, or in life, that is completely "free from doubt." Even a criminal conviction can be made based on a lesser standard, that is, a finding that is "beyond a reasonable doubt." While we agree with the comment in *Sanders* that a contract should "not be held invalid for technical or trifling reasons," and that the public policy violation should be clear, we must conclude that the "free from doubt" language used in *Sanders* is unfortunate hyperbole and we decline to utilize it as the standard by which a public policy determination is made. *See Sanders*, 288 S.W.2d at 478; *Mattox*, 1994 WL 698046, at *5 (stating that the impropriety must be "clear," citing *Stansell*, on which *Sanders* relies).

In this appeal, Blackburn & McCune asserts that, under Tennessee law, if the purpose of a contract is to "get around" a law or administrative regulation, this purpose violates public policy. In support, it cites *Freeman v. Thompson*, 600 S.W.2d 234 (Tenn. Ct. App. 1979). In *Freeman*, the plaintiff was a life insurance salesman, and the defendant was a mortgage

banker who wanted to procure a large amount of life insurance.[24]  The defendant banker, however, did not have sufficient funds to pay the premium on such a large amount of insurance, and Tennessee had an anti-rebate law in effect that prohibited an insurance company or insurance agent from paying or offering to pay a client's insurance premium in order to induce the sale of insurance.  *Freeman*, 600 S.W.2d at 235 (quoting T.C.A. § 56-1215).  The parties developed a scheme to "get around" the statutory prohibition against premium rebates.  They entered into a contract in which the defendant agreed to pay the plaintiff over $45,000 as the first year's premium for two life insurance policies with a total death benefit of $4 million; the plaintiff agreed to use this money only as a down payment on real estate sold by the defendant.  *Id.* at 235.  In actuality, the defendant planned to make the premium payments on the life insurance, but then be reimbursed by the plaintiff and his partner's attorney.  This plan allowed the plaintiff to receive benefits from the sale of such a large insurance policy, such as a substantial commission and a promotion.  *Id.*

The defendant in *Freeman* later refused to make the life insurance premium payments under the contract.  The plaintiff sued the defendant for the first year's premium on the life insurance policies pursuant to their agreement.  The evidence at trial showed that the contract on which the plaintiff sued was executed by the parties "simply to get around the anti-rebate statute of the State of Tennessee," and that the defendant had no intention of paying the plaintiff any money under the contract.  *Id.*  Based on the evidence, the trial court held that "both parties cooperated to circumvent the Tennessee Statutes which prohibit the rebate of insurance commission to the insured."  It nevertheless enforced the parties' contract, holding that the contract was not in contravention of the anti-rebate statutes or the laws of Tennessee. *Id.*  The defendant appealed.  The appellate court in *Freeman* reversed, affirming the trial court's finding that the purpose of the contract was to circumvent the anti-rebate statute, but concluding that the "agreement was tainted with illegality and is part of the overall scheme to get around the anti-rebate statutes . . . ."  Because the contract was part of a scheme to get around the effect of a state statute, the appellate court held that the plaintiff could not recover under the contract.  *Id.* at 236-37.

Blackburn & McCune argues that the situation in the case at bar is similar, in that the Pre-Paid Defendants drafted and executed the ASA in order to circumvent the loss ratio requirement established by the TDCI.  By obtaining an undisclosed "refund" of a portion of its provider fees from Blackburn & McCune under the ASA, the defendants recouped some of the fees and in reality had a loss ratio of only about 30%, contrary to the TDCI policy. Thus, it argues, the contract is unenforceable, and Blackburn & McCune is entitled to restitution.

---

[24]The defendant banker's wife was also named as a defendant.

Because the meaning of "public policy" can be "vague and variable," we approach with caution the determination of whether a contract is void based on public policy considerations. *See Home Beneficial Ass'n*, 177 S.W.2d at 546. Indeed, the judicial recognition of a public policy has been described as "a very unruly horse, and when you once get astride it you never know where it will carry you." 5 RICHARD A. LORD, WILLISTON ON CONTRACTS §12:2 (4th ed. updated May 2010) (quoting *Richardson v. Mellish*, 2 Bing. 229, 252, 130 Eng. Rep. 294, 303 (C.P. 1824), *quoted in Mattox v. Loretta Fin. Servs.*, No. 01A01-9307-CV-00308, 1994 WL 698046, at *5 (Tenn. Ct. App. Dec. 14, 1994)); *see also* JOSEPH M. PERILLO, CALAMARI & PERILLO ON CONTRACTS, at § 22.1 (5ᵗʰ ed. 2003) (noting the "amorphous and ubiquitous concept of 'public policy' ").

  Courts will declare contracts to be void based on a violation of public policy "only when the impropriety is clear and inherent in the contract, 'not merely collateral.' " *Vintage*, 309 S.W.3d at 465. The Tennessee Supreme Court has stated:

> [T]he public policy of the State is to be found in its Constitution, its laws, its judicial decisions and the applicable rules of common law. "Public policy" is practically synonymous with "public good," and unless the private contract is in terms of such a character as to tend to harm or injure the public good, public interest or public welfare, or to violate the letter or the spirit of the Constitution, laws, common and statutory, or judicial decisions of the State, it is not violative of public policy nor void on that account.

*Home Beneficial Ass'n*, 177 S.W.2d at 546; *see Spiegel*, 811 S.W.2d at 530 (stating that "[a] contract with a tendency to injure the public violates public policy").

In modern times, "[t]he declaration of public policy has . . . become largely the province of legislators rather than judges." RESTATEMENT (SECOND) OF CONTRACTS § 179 (1981) (cmt. b). However, in enacting legislation, legislators rarely explicitly address problems with contracts that may arise in connection with the conduct governed by the legislation. *Id.* "In such situations, it is pointless to search for the 'intention of the legislature.' " *Id.* Rather, the court must look to the purpose and history of the statute, and the policy manifested in it, to determine whether it should refuse to enforce a contract. *Id.*

This Court has previously utilized the approach outlined in the RESTATEMENT (SECOND) OF CONTRACTS in determining whether a contract is unenforceable as violative of public policy. *See State v. Heath*, 806 S.W.2d 535, 538-39 (Tenn. Ct. App. 1990) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 178). The RESTATEMENT provision quoted by the *Heath* Court

describes situations in which a contract or a contract term is unenforceable based on public policy considerations:

> § 178. When A Term Is Unenforceable On Grounds Of Public Policy
>
> (1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.
>
> (2) In weighing the interest in the enforcement of a term, account is taken of
>
>> (a) the parties' justified expectations,
>> (b) any forfeiture that would result if enforcement were denied, and
>> (c) any special public interest in the enforcement of the particular term.
>
> (3) In weighing a public policy against enforcement of a term, account is taken of
>
>> (a) the strength of that policy as manifested by legislation or judicial decisions,
>> (b) the likelihood that a refusal to enforce the term will further that policy,
>> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
>> (d) the directness of the connection between that misconduct and the term.

RESTATEMENT (SECOND) OF CONTRACTS § 178 (1981). "The thrust of the Restatement (Second)'s rules is to allow judicial flexibility in weighing the strength of legally recognized policies against the effect of declaring a particular bargain to be against public policy." PERILLO, *supra*, at § 22.1.

With this in mind, we consider the pertinent legislative provisions. Tennessee has enacted the Tennessee Legal Insurance Act, to govern legal insurance plans such as the plans marketed in Tennessee by the Pre-Paid Defendants. *See* T.C.A. § 56-43-101, *et seq.* The Legal Insurance act indicates clearly that its primary purpose is to protect consumers. *See* T.C.A. § 56-43-102(1)-(6) (2008). The Legal Insurance Act refers to and incorporates the general statutory procedures and standards for rate review for personal risk insurance. *See* T.C.A. § 56-43-106(b)(1) and (2) (2008).

Under Tennessee statutes, the rates charged by insurance companies subject to State regulation "shall not be excessive, inadequate or unfairly discriminatory." T.C.A. § 56-5-303(a)(1) (2008); § 56-43-106(b)(2)(B). A rate is deemed "excessive" if "it is likely to produce a profit that is unreasonably high for the insurance provided. . . ." T.C.A. § 56-5-303(b). Concomitantly, an insurer's rate may be deemed "inadequate" if it is "clearly insufficient to sustain projected losses and expenses . . . or, if continued, will have the effect of substantially lessening competition. . . ." T.C.A. § 56-5-303(c). The insurer's expenses are part of this determination. T.C.A. §§ 56-5-303(b), 56-5-304 (2008).

Insurance rates are subject to review and disapproval by the TDCI, in accordance with the above standards. T.C.A. §§ 56-5-308(a)(1), 56-43-106. Under the statutes, an insurer of personal risk insurance must file with the TDCI its rates, including the supporting information for the rates, at least thirty days in advance of the proposed effective date of the insurance plan. T.C.A. §§ 56-5-305(a), 56-43-106(b)(1). The TDCI then must follow the statutory procedure in approving or disapproving the proposed insurance rate. T.C.A. §§ 56-5-308(a), 56-43-106(c).

Rate filings by an insurer are open to inspection by the public. T.C.A. § 56-5-307(a). Upon written request, the insurer must furnish to an insured "all pertinent information as to the rate." T.C.A. § 56-5-309(a).

In considering the insurance rate statutes, Tennessee's Attorney General has discussed the importance of furnishing complete supporting information for insurance rates, in fulfilling the purposes of the statutes:

> The statute contains no definition of all of the charges which must be disclosed and are subject to review as "rates." However, the statutory scheme indicates that rates are required to be filed to serve at least two different purposes. First, the [TDCI] Commissioner, as part of her statutory responsibilities, must be able to review them to ensure that they are not excessive, inadequate, or unfairly discriminatory. Second, complete and accurate information regarding rates must be available to the public at large and, in a more detailed fashion, to any insured.

Tenn. Op. Atty. Gen. No. 94-033, 1994 WL 88620, at *2 (Tenn. A.G.) In discussing whether commissions charged by an insurance agent would have to be reflected in the rate filing information filed by the insurance company, the Attorney General stated:

> We think that both . . . purposes [of the insurance rate statutes] are best served by including all charges and costs paid by the insured to obtain the coverage

-33-

under the applicable policy within the term, "rates" which must be filed under the statute . . . . Excluding such charges would mean the schedules would not accurately reflect the actual policy costs to the insureds. Such an exclusion would leave the [TDCI] Commissioner unable to examine rates to determine whether they are excessive, inadequate, or discriminatory. Further, if such charges are excluded, neither the public nor insureds would receive accurate information regarding the amount they must actually pay for such coverage.

*Id.* Thus, Tennessee's Attorney General opined that the statutory purposes of allowing the TDCI Commissioner to fulfill the statutory responsibility for rate approval, and furnishing rate information to the public and to insureds, are best served by requiring insurance companies to file "complete and accurate information regarding rates." *Id.*

As noted above, the TDCI has adopted loss ratios as a mechanism for fulfilling its statutory duty to evaluate whether an insurance company's premium rates are excessive or inadequate in relation to its claims expenses. TDCI representative Jaquish explained that the target loss ratio can range from 35% to 50%, depending on a variety of factors, and the loss ratios are not set forth in written regulations. However, the loss ratios clearly represent the TDCI's judgment of the correct proportion of claim expenses to premium for a given insurance plan.

Against this backdrop, we must determine whether summary judgment was appropriate on Blackburn & McCune's claim that the ASA should be deemed unenforceable as violative of public policy. The overall approach outlined in Section 178 of the RESTATEMENT (SECOND) OF CONTRACTS involves weighing any public policy against enforcement of the contract versus the interest in enforcement of the contract. The contract is deemed unenforceable only if the public policy against enforcement clearly outweighs the interest in its enforcement. RESTATEMENT (SECOND) OF CONTRACTS § 178 (1981).

In this case, we agree with the Tennessee Attorney General's opinion that the two statutory purposes for requiring insurance companies to file rate information with the TDCI are to allow the TDCI to review the rates and also to provide "complete and accurate information regarding rates" to the public and to insureds. If, as alleged by Blackburn & McCune, the purpose of the ASA was to recoup some of the Pre-Paid Defendants' claim expenses without disclosing the recoupment scheme to the TDCI and, ultimately, to the public, the purpose of the ASA would be in contravention of the purpose of the statutory scheme set forth above. *See also* RESTATEMENT (SECOND) OF CONTRACTS § 179 ("A public policy against the enforcement of promises or other terms may be derived by the court from (a) legislation relevant to such policy, or (b) the need to protect some aspect of the public welfare. . . ."). This conclusion is consistent with *Freeman*, *supra*, in which a contract was deemed

unenforceable because it was part of a scheme to circumvent a state statute. ***See Freeman***, 600 S.W.2d at 236-37.

If the evidence at trial establishes the Pre-Paid Defendants' purpose behind the ASA was to recoup some of its claims expense without reflecting that recoupment in the rates filed with the TDCI, then a determination that the ASA is unenforceable as against public policy would further the statutory purpose of requiring insurance companies to furnish complete and accurate rate information to the TDCI and, ultimately, to the public. It could be inferred from the evidence submitted by Blackburn & McCune that, particularly in view of the Pre-Paid Defendants' arrangements in Texas, the ASA was devised in a deliberate effort to circumvent the TDCI's loss ratio requirement and conceal the *real* claims expense from the TDCI and the public; if so, this misconduct could be deemed to be serious. ***See*** RESTATEMENT (SECOND) OF CONTRACTS §178(3)(c).

However, even if the purpose of the ASA is contrary to public policy, under the RESTATEMENT approach, this does not mean that it is *per se* void or unenforceable. Consistent with Tennessee law, "[t]he 'bent' of the Restatement seems to favor enforcement in doubtful cases." ***Springlake Corp. v. Symmarron Ltd. Pship.***, 569 A.2d 715, 719 (Md. Ct. App. 1990) (applying RESTATEMENT (SECOND) OF CONTRACTS § 178). In addition to determining whether the purpose of the contract violates public policy, under the balancing approach set out in the RESTATEMENT, the trial court must take into account the parties' justified expectation that the ASA would be enforced, any forfeiture that would result from a holding that the contract is unenforceable, and any special public interest in the enforcement of the ASA. RESTATEMENT (SECOND) OF CONTRACTS, § 178(2). At this juncture, the parties have pointed to little evidence developed in the record on these factors.

Moreover, the relief sought by Blackburn &McCune is relevant to the Court's ultimate decision on the enforceability of the ASA. Blackburn & McCune does not ask the Court to refrain from "allow[ing] itself to be made an instrument of enforcing obligations" under an allegedly illegal contract. ***Reaves***, 279 S.W. at 258. Rather, Blackburn & McCune seeks affirmative relief from the Court, *to wit*, restitution on a contract that has been fully performed by both parties. Such relief may be available, but may require the Court to consider additional factors, such as any knowledge or culpability of the party seeking restitution. ***See*** RESTATEMENT (SECOND) OF CONTRACTS §§ 197 and 198 (restitution on an unenforceable contract is generally unavailable unless the party seeking restitution was excusably ignorant of the facts or was not equally in the wrong with the other party to the contract). Account is taken of "the gravity of the public interest involved and the extent of the contravention." ***Id.*** § 197 cmt. b. The court may also take into account whether the public policy at issue is intended to protect persons in the class to which the claimant

belongs. *Id.* § 198 cmt b. On remand, the parties may submit evidence on all of these factors to the trial court for its consideration.

Thus, under all of these circumstances, in light of the summary judgment standard under *Hannan*, we conclude that the evidence presented by the Pre-Paid Defendants does not, at this juncture, negate an element of Blackburn & McCune's claim or render Blackburn & McCune unable to establish public policy considerations which would weigh against enforcement of the ASA. *See Hannan*, 270 S.W.3d at 8-9; *see, e.g., Calif. Pac. Bank v. Small Bus. Admin.*, 557 F.2d 218, 223-25 (9th Cir. 1977) (finding that contracts designed to circumvent Small Business Act were deemed illegal and unenforceable despite the fact that the SBA was initially aware of the bank's arrangement and took no action to stop it). Therefore, the grant of summary judgment on this claim must be reversed.

## II.  Fees Not Due Under the ASA

In its brief in opposition to the Pre-Paid Defendants' motion for summary judgment, Blackburn & McCune argues that, even if the ASA is deemed valid, summary judgment in favor of the defendants was inappropriate, because the law firm is entitled to recover $77,485 in fees it paid to the Pre-Paid Defendants under the ASA that were not due thereunder. Blackburn & McCune argues that the trial court "simply overlooked" this claim for fees paid, but not due, under the ASA. Specifically, Blackburn & McCune claims that the ASA required the law firm to pay the defendants a fee with respect to four legal expense plans, numbers 242, 202, 242OPT, and 202OPT. It now claims that the Defendants charged, and it paid, fees on three other "specialty" plans as well, numbers 261, 266, and 274. Because the ASA did not contemplate payments for these plans, Blackburn & McCune asserts, such amounts were collected in violation of the ASA and it is entitled to a refund of these amounts. At the very least, it contends, the Defendants are not entitled to summary judgment in light of this viable claim.

Each claim in Blackburn & McCune's second amended complaint is based on the position that the ASA is not a valid, binding agreement. In contrast, the law firm's assertion that it is due fees that it erroneously paid under the ASA presumes the validity of the contract. This is, in essence, an alternative claim for relief. Blackburn & McCune did not assert this alternative argument in its complaint. Rather, this new claim was raised for the first time in its opposition to the Pre-Paid Defendants' motion for summary judgment.

In our view, a plaintiff may not raise a new theory of recovery for the first time in response to the defendants' motion for summary judgment. Rather, the proper procedure would have been to seek to the amend the complaint to assert this alternative form of relief. *See Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)

(quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2723 (3d ed. Supp. 2005)). "To permit a plaintiff to do otherwise would subject defendants to unfair surprise." *Id.* This rule is widely accepted in the federal courts, and we find it appropriate to apply it in the instant case.[25] *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Therefore, we find no error in the trial court's failure to address Blackburn & McCune's alternative claim that it is entitled to damages under the ASA, if it is deemed enforceable, or its failure to conclude that this breach of contract issue precludes a grant of summary judgment in favor of the Pre-Paid Defendants.

### III. Filed Rate Doctrine

Finally, Blackburn & McCune argues that it is entitled to summary judgment on its claim for damages under the filed rate doctrine, because the Pre-Paid Defendants did not pay the law firm the full "claims expense" that was filed with and approved by the TDCI. According to Blackburn & McCune, the "claims expense" rates filed, compared to the actual rates paid, are as follows:

| Plan | Filed/Approved Rate | Rate Paid |
|---|---|---|
| No. 261(1-50 employees) | $37.50 | $32.00 |
| No. 261(51-99 employees) | 62.50 | 57.00 |
| No. 202 | 7.50 | 6.00 |
| No. 242 | 7.50 | 6.00 |
| No. 202OPT | 11.40 | 9.00 |
| No. 242OPT | 11.40 | 9.00 |

Blackburn & McCune contends that it should be awarded damages in the amount of the difference between the filed rate and the paid rate, $2,922,342.40, plus pre-judgment interest.

In response, the Pre-Paid Defendants argue that the filed rate doctrine is not applicable in this case because (1) the doctrine applies only to claims by *insureds* relating to *premium rates*, and does not apply to a claim by a service provider as to the rates paid for services, and (2) the doctrine is available only as a shield, not a sword; that is, it may only be used as a

---

[25]The Tennessee Supreme Court has recognized that federal cases interpreting the Federal Rules of Civil Procedure which are virtually identical to the Tennessee Rules of Civil Procedure provide useful guidance. *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 49 (Tenn. 1986).

defense, and not as a basis for affirmative relief.[26]  In addition, the Pre-Paid Defendants argue that Blackburn & McCune's claim under the filed rate doctrine, even if the doctrine is applicable, fails on the facts in this record.  They assert that the undisputed evidence shows that the "claims expense" rates filed with the TDCI included general and administrative expense in addition to the payments to the provider law firm.  The Pre-Paid Defendants maintain that Blackburn & McCune was in fact paid the rates that were represented to the TDCI.  Therefore, they contend, regardless of whether the filed rate doctrine is applicable, they are entitled to summary judgment.

The trial court found that the filed rate doctrine is generally applicable to the insurance industry in Tennessee in the context of the relationship between the insurer and its insureds.  The trial court declined to apply the filed rate doctrine to protect the relationship between "regulated entity and provider firm," and it dismissed Blackburn & McCune's claim on that basis.

Under the filed rate doctrine, a regulated entity is forbidden "to charge rates for its services other than those [rates] properly filed with the appropriate federal regulatory authority." ***Ark. La. Gas Co. v. Hall***, 453 U.S. 571, 577 (1981).  This "century-old" doctrine originated in decisions of the United States Supreme Court, such as ***Keogh v. Chicago & Nw. Ry. Co.***, 260 U.S. 156 (1922), in the context of railroad shipping rates published with the Interstate Commerce Commission under the Interstate Commerce Act. ***See AT&T Co. v. Cent. Office Tel., Inc.***, 524 U.S. 214, 222 (1998).  Since ***Keogh***, application of the doctrine "has been extended across the spectrum of regulated utilities." ***Hall***, 453 U.S. at 577.  "Although the doctrine has been applied primarily in the context of federal regulation, it applies equally where state law creates a state agency and a statutory scheme pursuant to which the state agency determines reasonable rates." ***Sw. Bell Tel. Co. v. Metro-Link Telecom, Inc.***, 919 S.W.2d 687, 693 (Tex. Ct. App. 1996).  "Thus, under the filed rate doctrine, a regulated entity may not charge rates which are different than the rate filed, nor may plaintiffs challenge rates properly filed with a regulatory agency." ***Rios v. State Farm Fire & Cas.***, 469 F. Supp. 2d 727, 734 (S.D. Iowa 2007) (citations omitted).

The filed rate doctrine has two purposes.  The first is "nonjusticiability," preserving the role of the regulating agency in approving rates by "keeping courts out of the rate-making process . . . a function that the [ ] regulatory agencies are more competent to perform." ***Id.***  The second purpose is "nondiscrimination," that is, "ensur[ing] that regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." ***Id.*** (quoting ***Hill v. BellSouth Telecomms., Inc.***, 364 F.3d 1308, 1316 (11th Cir.2004)); ***see H.J.***

---

[26]On appeal, the Pre-Paid Defendants do not appear to challenge the law firm's calculations; instead, they argue that the filed rate doctrine is not applicable in this case.

***Inc. v. Nw. Bell Tel. Co.***, 954 F.2d 485, 488 (8ᵗʰ Cir. 1992); ***Marcus v. AT&T Corp.***, 138 F.3d 46, 58 (2d Cir. 1998). Courts must apply the filed rate doctrine "strictly . . . whenever either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by [plaintiffs' proposed] cause of action . . . ." ***Marcus***, 138 F.3d at 59.

In Supreme Court decisions applying the filed rate doctrine, it has been strictly applied. The Court has held that, even if the filed rate was misrepresented or misquoted to the consumer, or if certain rebates were promised, the regulated entity cannot be held to the misrepresented, misquoted, or promised rate if it conflicts with the filed rate. ***See Kansas City S. R. Co. v. Carl***, 227 U.S. 639, 653 (1913). Though strict application of the doctrine has the potential to cause harsh results at times, the rule furthers the goal of preventing unreasonable and discriminatory charges by regulated entities. ***See AT&T Co.***, 524 U.S. at 222; ***Maislin Indus., U.S., Inc. v. Primary Steel, Inc.***, 497 U.S. 116, 130-31 (1990) (recognizing that "[t]he duty to file rates . . . and the obligation to charge only those rates . . . have always been essential to preventing price discrimination and stabilizing rates"). The Supreme Court has explained:

> Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

***Louisville & Nashville R. Co. v. Maxwell***, 237 U.S. 94, 97 (1915). Thus, "[r]egardless of the carrier's motive — whether it seeks to benefit or harm a particular customer — the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services." ***AT&T Co.***, 524 U.S. at 223. Therefore, once the rates are filed and approved with the regulatory agency, the parties' "rights as defined by the [rate] cannot be varied or enlarged either by contract or tort of the [regulated entity]." ***Keogh***, 260 U.S. at 163.

In some states, the filed rate doctrine has been extended to the insurance industry. ***See, e.g., Rios***, 469 F. Supp. 2d at 736-37; ***Kirksey v. Am. Bankers Ins. Co. of Fla.***, 114 F. Supp. 2d 526, 529 (S.D. Miss. 2000); ***Korte v. Allstate Ins. Co.***, 48 F. Supp. 2d 647, 651 (E.D. Tex. 1999). In ***Rios***, the Iowa district court noted that insurance rates in that state are subject to a comprehensive regulatory scheme designed to prevent such rates from being "excessive,

inadequate, or unfairly discriminatory." *Rios*, 469 F. Supp. 2d at 736. Similar to the law in Tennessee, insurance agencies seeking to do business in Iowa are required to file their rates with the Iowa Insurance Commissioner, and the Commissioner is charged with approving or disapproving the filed rates. The Iowa Commissioner continually administers the rates and may order discontinuance of a rate if it no longer meets the requirements of the rate standards. *Id.* Given this regulatory scheme and the purposes of the filed rate doctrine, the Iowa district court held that the doctrine was applicable in Iowa, because the state agency determined "reasonable rates pursuant to a statutory scheme." *Id.* (citing *Korte*, 48 F. Supp. 2d at 651).

No Tennessee court has addressed whether the filed rate doctrine is applicable to the insurance industry in this State.[27] As noted above, as in *Rios*, Tennessee has a comprehensive regulatory scheme under which insurance companies must file proposed rates with the TDCI, and the TDCI Commissioner has been given the authority to approve or reject the proposed rates in order to protect the public from "excessive, inadequate or unfairly discriminatory rates." *See* T.C.A. § 56-43-106; § 56-5-303(a). For purposes of this appeal, we assume, without deciding, that the filed rate doctrine would be applicable to the insurance industry in Tennessee. That does not end our inquiry.

Assuming that the filed rate doctrine would apply to a state-regulated insurance entity, the Pre-Paid Defendants argue that Blackburn & McCune may not recover damages under the doctrine in this lawsuit. As a service provider, Blackburn & McCune seeks to recover the capitated "claims expense" rate filed by the Pre-Paid Defendants with the TDCI. The Pre-Paid Defendants argue that the filed rate doctrine applies only to *insureds* seeking to recover insurance *premium* rates. In other words, they claim, the filed rate doctrine was not intended to protect the relationship between the provider and the insurance company; rather, it was intended to protect consumers from the misdeeds of insurers.

For its part, Blackburn & McCune claims that the filed rate doctrine applies to all rates filed with the regulatory agency and cites broad language in caselaw. For example, in *Rios*, the court refers to the filed rate doctrine as applying "to the services or benefits that have been filed with and approved by the Insurance Department." *See Rios*, 469 F. Supp. 2d at 735.

---

[27]Blackburn & McCune contends that *Leggett v. Duke Energy Corp.*, No. W2007-00788-COA-CV, 2008 WL 4756653 (Tenn. Ct. App. Oct. 29, 2008), adopted the filed rate doctrine, in stating that "rates filed with and approved by a regulatory body, such as TDCI, must be enforced." *Leggett*, however, did not directly address whether the filed rate doctrine would be applicable to the insurance industry in Tennessee. In addition, that case was reversed upon grounds not relevant here. *Leggett v. Duke Energy Corp.*, No. W2007-00788-SC-R11-CV, 2010 WL 1644136 (Tenn. Apr. 23, 2010). Therefore, it is not determinative as to the issues presented in the instant case.

In *Rios*, the plaintiff insureds filed a lawsuit seeking the return of premiums paid under a homeowner's insurance contract, arguing that they did not receive the services promised under the terms of the contract that was filed with the Iowa Department of Insurance. Applying the doctrine broadly, the *Rios* court held that the plaintiffs' claim for damages was barred by the filed rate doctrine, reasoning that "the nondiscriminatory principle behind the filed rate doctrine would be defeated if courts allowed a claim for excessive rates to be couched as a claim for inadequate service, and vise versa." *Id.* at 735.

We note, however, that in *Rios*, the filed rate doctrine was applied to a claim by an insured against an insurer. Indeed, Blackburn & McCune has not cited, nor have we found, any case in which the doctrine was applied to a claim by a provider of services under an insurance plan to hold the insurance company liable in damages for the provider rates filed with the state department of insurance. In all of the cases cited by the parties, the doctrine has been applied to bar a challenge by an *insured* or *consumer* in a suit to recover premiums or a portion of premiums, asserting breach of contract, fraud, or excessive rates. *See, e.g., Edge v. State Farm Mut. Auto Ins. Co.*, 623 S.E.2d 387 (S.C. 2005) (insured's action for declaratory action barred by filed rate doctrine); *Horowitz ex rel. Gilbert v. Bakers Life & Cas. Co.*, 745 N.E.2d 591 (Ill. Ct. App. 2001) (insured's suit to recover on theories of breach of contract and fraud were barred by the filed rate doctrine); *American Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1203-04 (Miss. 2001) (insured's claims to recover excessive premiums was barred by the filed rate doctrine); *Prentice v. Title Ins. Co. of Minn.*, 500 N.W.2d 658, 659-60 (Wis. 2003) (insured's suit to recover based upon the defendants' alleged participation in illegal price fixing was barred by the filed rate doctrine).

Moreover, application of the filed rate doctrine as urged by Blackburn & McCune does not advance the two purposes of nonjusticiability and nondiscrimination in the premiums charged to consumers. Blackburn & McCune seeks to apply the doctrine to the relationship between the provider of services and the insurance company, typically both sophisticated business entities. It has been observed that "[t]he Supreme Court 'has not recently expressed an inclination to extend the filed rate doctrine beyond contexts clearly implicating the anti-discrimination or non-justiciability rationales for the rule.'" *U.S. Wats, Inc. v. AT&T Co.*, No. CIV. A. 93-1038, 1994 WL 116009, at *5 (E.D. Pa. Apr. 5, 1994) (quoting *Gelb v. AT&T Co.*, 813 F. Supp. 1022, 1028 (S.D.N.Y. 1993)).

For these reasons, we agree with the trial court that the filed rate doctrine is not intended to protect the relationship between the regulated insurance company and its service providers. Rather, it is intended to protect the relationship between the regulated entity and the consumers who purchase goods or services from that entity. Finding in favor of Blackburn & McCune on this issue would be to apply the doctrine in a context not yet applied by any other court, state or federal, and in a manner that does not further the purposes of

nonjusticiability or nondiscrimination. Therefore, we affirm the trial court's holding that the Pre-Paid Defendants are entitled to summary judgment on Blackburn & McCune's claim under the filed rate doctrine. This holding pretermits all other issues on appeal related to this claim.

## CONCLUSION

In sum, we reverse the trial court's grant of summary judgment in favor of the Pre-Paid Defendants on Blackburn & McCune's claim that the ASA was fraudulently induced, and on Blackburn & McCune's claim that the ASA is unenforceable as a violation of public policy. We remand for further proceedings related to these claims. We affirm the trial court's grant of summary judgment in favor of the Defendants on Blackburn & McCune's claim based on the filed rate doctrine.

The decision of the trial court is affirmed in part and reversed in part, as set forth above, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed one-half to Appellant Blackburn & McCune and its surety, and one-half to Appellees Pre-Paid Legal Services, Inc. and Pre-Paid Legal Services of Tennessee, Inc., for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE